UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SOUTHERN WORCESTER COUNTY REGIONAL VOCATIONAL SCHOOL DISTRICT, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 06-40230-FDS |
| v. | ) ) ) | |
| UTICA MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM AND ORDER ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT [CORRECTED]**

**SAYLOR, J.**

This is an action seeking to recover on a series of public official bonds. Plaintiff Southern Worcester County Regional Vocational School District contends that defendant Utica Mutual Insurance Company has failed to honor a series of public official bonds in the wake of a massive embezzlement by a school district employee. Specifically, Southern Worcester asserts claims for breach of contract and for unfair and deceptive acts and practices in violation of Mass. Gen. Laws ch. 93A, § 11 and Mass. Gen. Laws ch. 176D, § 3.

The parties have filed cross-motions for summary judgment. For the reasons stated below, plaintiff's motion will be granted as to liability on Count 1 and denied as to Count 2. Defendant's motion will be denied as to both counts.

**I.    Background**

The following facts are undisputed unless otherwise noted.

### A. The Issuance of the Bonds and the Embezzlement

Southern Worcester County Regional Vocational School District is a regional vocational district serving several Massachusetts towns. As of 1990, Paul Blanchette was the Assistant Superintendent of Business for the district.

In August 1990, the Treasurer of Southern Worcester, Robert Patrowicz, died. On August 20, the School Committee voted the following, as reflected in the minutes of the meeting:

APPOINTMENT OF TREASURER—As requested by the Chairman,

\* \* \*

A MOTION was made by Robert H. Hill that the Treasurer's position be eliminated and that the duties and responsibilities under the position of Treasurer be incorporated with the duties of the Assistant Superintendent of Business and further that a one-time $2,000 increase in salary be added to these duties. Seconded by Dr. Rene J. Hamel.

After discussion regarding combining the two positions, and a brief explanation of the procedures followed in his office, it was

VOTED:   For: 5   Opposed: 2

(Lafleche Aff., ¶7, Attachment 1).

Blanchette continued to serve as Assistant Superintendent of Business after the vote. The parties dispute whether he also held the position of "Treasurer"; it is undisputed, however, that he thereafter performed the duties that were previously performed by Patrowicz. Those duties included signing notes for loans, transferring funds among accounts, signing checks, reconciling bank statements, and otherwise authorizing, recording, and verifying the financial transactions of Southern Worcester. Blanchette also issued nine annual statements (covering the years 1991 through 1999) to the member towns of the district for the amount in the "Excess and Deficiency"

account.  Blanchette certified these statements as "Treasurer" of Southern Worcester.[1]

On August 27, 1992, Utica Mutual Insurance Company issued a Public Official Bond to Southern Worcester.  The bond stated that Utica (the surety) and Blanchette (the principal) jointly and severally bound themselves to Southern Worcester (the obligee) to pay the penal sum of $150,000 if the principal failed to "well and truly perform all the duties of his said office or position, and account for all funds coming into his hands by virtue of his said office or position as required by law . . . ."  (Def. Ex. 5).  The bond also specifically stated that Blanchette was "duly elected or appointed to the office or position of 'Treasurer of Southern Worc. County Reg. Voc. School' for the term beginning 'August 18, 1992' and ending 'August 18, 1993.'"  *Id.*[2]

Utica also issued bonds to Southern Worcester for the years 1993-1994, 1994-1995, 1995-1996, 1996-1997, 1997-1998, 1998-1999, and 1999-2000.  All of the bonds were identical in format and language to the first, except that each specified a distinct term for which Blanchette was appointed to the office of Treasurer (for example, the 1993-1994 bond stated that Blanchette's term was from August 18, 1993, to August 18, 1994).[3]  All the bonds were labeled with the same "Bond Number" as the 1992-1993 bond:  1559050.  Southern Worcester paid a $525 premium to Utica each year from 1992 to 1999.

Beginning at least as early as August 1990, and until his resignation in January 2000,

---

[1] On October 25, 1990, the secretary of the School Committee of Southern Worcester executed a bank resolution certifying that Blanchette was the Treasurer and authorizing him to conduct banking transactions for the district's accounts.  Nearly identical resolutions were executed in subsequent years through 2000.

[2] The bond was signed by a representative of Utica, but not by Blanchette.  Utica does not, however, raise the lack of signature as a defense.

[3] The bonds for 1996-1997, 1997-1998, and 1998-1999 were not signed by a Utica representative. Blanchette did not sign any of the bonds.  Again, Utica has not raised the issue as a defense.

Blanchette embezzled more than $6.5 million from the school district. He wrote checks to himself from district bank accounts, which he signed as Treasurer of Southern Worcester. To conceal these losses and replenish the accounts, Blanchette took out various loans in the name of the district. He also forged annual audit reports that appeared to be from an independent auditor, and submitted those reports to federal agencies from which Southern Worcester received funding and to banks from which it received loans. Blanchette also submitted false monthly financial statements to the School Committee.

Blanchette resigned his employment with Southern Worcester in January 2000, and ultimately pleaded guilty to embezzlement in federal court. He has acknowledged that he embezzled more than $150,000 during every August-to-August one-year period from 1992 through 2000.

### B.     The Negotiations Between Southern Worcester and Utica

The embezzlement was discovered by Southern Worcester in January 2000. In February 2000, Southern Worcester notified Utica of its intent to submit a claim under the bonds. Utica retained an accounting firm to investigate the embezzlement. At some unspecified point, Southern Worcester became aware that Utica intended to assert that its total potential liability under the bond claim was only $150,000. In October 2001, Southern Worcester sent a letter to Utica contending that the eight bonds each gave rise to separate liability and stating that any refusal to pay the undisputed portion of an insurance claim would be a violation of Mass. Gen. Laws ch. 93A and ch. 176D. Utica responded later that month that its total liability was only $150,000, and requested that Southern Worcester submit a proof of loss for that amount. Utica included a proof of loss form with the letter.

Southern Worcester apparently did not submit the form as requested. In May 2002, it sent another letter to Utica, characterizing the proof of loss form as requiring it to "release Utica from all claims arising under the bonds before Utica will pay the District the $150,000 that Utica acknowledges the Southern Worcester is owed." (Pl. Rec. 188-89). It again raised the issue of a potential violation of Mass. Gen. Laws ch. 93A and ch. 176D, and demanded that Utica make payment of $150,000 within thirty days.

In December 2002, Massachusetts counsel for Utica responded by letter, stating that ". . . we can work out language with respect to the $150,000 claim under the bond that should be paid at this time. I am sure we can work out agreeable language with respect to that amount and get that claim resolved." (*Id.* at 191).

There is nothing in the record concerning Southern Worcester's response to that letter, or the parties' interactions generally in 2003. In January 2004, Utica advised Southern Worcester in another letter that ". . . we are concerned that Utica's position regarding [Southern Worcester's] claim under the public official bond needs to be clarified . . . . Utica is willing to settle [the] claim for $150,000 subject to an appropriate release." (*Id.* at 193). Unlike the December 2002 letter, that letter also expressly stated that the offer of $150,000 was for settlement purposes only and Utica did not "acknowledge[] the District is owed that amount." (*Id.*).

The record is silent until October 2005, when Utica again corresponded with Southern Worcester. It stated it had finally concluded its investigation, and the results "fully support denial of the District's claim." (*Id.* at 196). Utica reiterated its offer to settle the case for $150,000. In May 2006, Southern Worcester sent a demand letter pursuant to Mass. Gen. Laws ch. 93A and ch. 176D, asserting that Utica's handling of the investigation and ultimate denial of payment were

5

unfair and deceptive practices and unfair claims settlement practices.

Southern Worcester filed the present action on September 29, 2006.

## II. Analysis

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the non-movant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

Plaintiff has moved for summary judgment in its favor as to all counts. Utica has cross-moved for summary judgment, principally on the grounds that the claims are barred by the statute of limitations.

### A. Claim for Breach of Contract

There are four issues as to the breach of contract claim: (1) whether the claim is barred by the applicable six-year statute of limitations; (2) whether Utica may assert, as a defense, a claim that the policy was obtained by misrepresentation because Blanchette was not the official "Treasurer" of Southern Worcester; (3) whether Utica may assert a defense based on the comparative negligence of Southern Worcester; and (4) whether there was a single "continuous bond" that was in effect for eight years, as opposed to a series of one-year bonds. Each issue will be considered in turn.

#### 1. Whether the Claim Is Barred by the Statute of Limitations

In Massachusetts, a breach of contract claim must be brought within six years after the cause of action accrues. *See* Mass. Gen. Laws ch. 260, § 2. Here, Southern Worcester discovered the embezzlement in January 2000, and notified Utica in February 2000 of its intent to file a claim. It did not file suit, however, until September 29, 2006. The question is whether the cause of action did not accrue until some point after September 29, 2000.

According to Utica, the claim accrued when the defalcation was, or reasonably should have been, discovered by Southern Worcester. It is true that under ordinary circumstances, a claim arising out of a breach of condition in a bond accrues when the condition is breached (for example, when a principal commits a defalcation). *See McKim v. Glover*, 161 Mass. 418, 421 (1894).[4] In a case involving fraudulent concealment, a claim does not ordinarily accrue until the injured party discovers, or reasonably should have discovered, the fraud. *See, e.g.*, *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 131 (1st Cir. 1987).

Southern Worcester contends, however, that this matter should be treated like a claim under an insurance policy, which would mean the action accrued at a much later point. Under Massachusetts law, a claim against a liability insurer that has not accepted liability, but instead investigates the matter and considers the merits of the claim, does not accrue until the insurer states its "final and definitive position" rejecting the claim. *Nortek, Inc. v. Liberty Mut. Ins. Co.*,

---

[4] *McKim* involved a suit on a bond given by a trustee for an estate. The issue presented was whether the limitations period ran from the date the trustee actually stole the funds and accordingly breached his trust (in which case the limitations period had run) or from the date of the trustee's failure to pay over the amount in issue at the time of final settlement of the estate (in which case it had not). 161 Mass. at 420-21. The court (Holmes, J.) noted that "The grievance in an action of contract upon a bond like this is not the breach of trust *per se*, but the breach of condition." *Id.* at 421. It then held that "[t]here may be as many conditions in a bond as there are different aspects, incidents, or consequences of the same substantive wrong, and each breach of condition *gives rise to a distinct grievance*." *Id.* (emphasis added). The claim for failure to pay over the amount in final settlement—which was brought within the statutory period when measured from the later breach—was accordingly timely. *See id.*

65 Mass. App. Ct. 764, 768-69 (2006) (finding that claim for breach of the implied covenant of good faith and fair dealing accrued when insurance company finally and definitively insisted on a position that it had first announced some time earlier but left subject to further consideration); *see also Berkshire Mut. Ins. Co. v. Burbank*, 422 Mass. 659, 662-64 (1996) (concluding that claim under motor vehicle insurance policy for uninsured motorist coverage accrued when insurer breached policy by refusing to submit to arbitration, not when motor vehicle accident occurred). Here, Utica neither accepted nor definitively rejected liability for some period of time, but instead elected to investigate the claim and to request further information from the plaintiff.

The Court agrees that the surety bond should be treated in the same manner as an insurance policy for statute of limitation purposes. In this context, at least, there is no reason to distinguish between the two. Both are, in substance, forms of insurance, and the rationale behind delaying accrual of the cause of action in one instance is equally applicable to the other. Among other things, it would be a needless waste of judicial resources to require plaintiff to file suit while defendant is conducting an investigation and has not arrived at a final decision.

Accordingly, the claim did not accrue until October 2005, when Utica advised plaintiff that it had completed its investigation and that the facts "fully support denial of the District's claim." The complaint was filed less than one year later, and the breach of contract claim is therefore not time-barred.

### 2. Whether Blanchette Held the Position of "Treasurer"

Utica also asserts that the policy was obtained by misrepresentation or fraud because Blanchette was not, in fact, the "Treasurer" of Southern Worcester. In August 1992, Blanchette filed a written application with Utica entitled "Application for an Official Public Bond." In the

application, Blanchette represented that he was appointed "Treasurer" for an indeterminate term beginning August 18, 1990.  Utica contends that at the August 1990 School Committee meeting, Blanchette was not "appointed" as Treasurer, but rather the *position* of "Treasurer" was eliminated and Blanchette (still officially employed as the Assistant Superintendent of Business) assumed the *duties* previously performed by the Treasurer.  According to Utica, Blanchette's statement on the application that he was appointed "Treasurer" was a misrepresentation that renders any contractual obligation it may have had voidable.  *See, e.g.*, *Shaw's Supermarkets, Inc. v. Delgiacco*, 410 Mass. 840, 842 (1991) (contract induced by fraudulent misrepresentations is voidable).

To establish fraud in the inducement, a party must prove that "(1) [the defendant] made misrepresentations of a material fact, (2) that [it] knew, or should have known, to be false, (3) which were made to induce the [plaintiff] to act thereon, (3) that the [plaintiff] did, indeed, act thereon, (5) in reasonable reliance that the statements were true."  *Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70, 85 (D. Mass. 1998) (citing *Danca v. Taunton Sav. Bank*, 385 Mass. 1, 8 (1982)) (additional citations omitted).[5]

There is conflicting evidence as to whether Blanchette was, in fact, the "Treasurer" of Southern Worcester.  The August 1990 School Committee meeting minutes state that the position of Treasurer was "eliminated," suggesting that he was not.  However, the next clause in that same sentence states that "the duties and responsibilities under the position of Treasurer [will] be

---

[5] Utica also relies on the Restatement (Third) of Suretyship and Guaranty § 12(1), which states "if the secondary obligor's assent to the secondary obligation is induced by a fraudulent or material misrepresentation by the obligee upon which the secondary obligor is justified in relying, the secondary obligation is voidable by the secondary obligor."

incorporated with the duties of the Assistant Superintendent of Business." The secretary of the School Committee annually certified thereafter that Blanchette was Southern Worcester's "Treasurer." And it is not disputed that he performed the duties of Treasurer at all relevant times.[6]

Arguably, even if Blanchette did not hold the title of "Treasurer," any "misrepresentation" on the application form was technical at best, and thus immaterial. No other person held that title, and Blanchette performed all of the duties of a "Treasurer," whether or not he held that formal title.

In any event, the form itself does not provide any basis for reasonable *reliance* by Utica upon any claimed misrepresentation. While the first page of the application form states that the bond will cover Blanchette's duties as "Treasurer," Blanchette stated on the second page that the duties of his position were "Treasurer/Business Mgr." Blanchette thus openly revealed his dual role to the defendant. *See Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 235 (2d Cir. 1995) ("[I]t is the duty of sureties to look out for themselves and ascertain the nature of [their] obligations. . . . [S]ureties must usually take the initiative and inquire about information they deem important.") (internal quotation and citations omitted); *Augusta Fuel Co. v. Bond Safeguard Ins. Co.*, 502 F. Supp. 2d 124, 133-34 (D. Me. 2007) (citing *Rachman*).

Moreover, courts have generally held that any misrepresentation or fraud by a principal to

---

[6] Massachusetts law requires that every regional school district have a treasurer, who "shall receive and take charge of all money belonging to the district, and shall pay any bill of the district which shall have been approved by the [school committee]." Mass. Gen. Laws ch. 71, § 16A.

After the highly-publicized Blanchette embezzlement, the Massachusetts legislature amended section 16A to provide as follows: "[a] business manager, assistant superintendent for business or employee with title of similar import with responsibilities similar to those of a town accountant . . . shall not hold the office of treasurer or assistant treasurer or hold any responsibility for the receipt or disbursement of money."

a surety in connection with the issuance of a bond does not absolve the surety of liability to the obligee, provided the obligee does not know of or participate in the fraud. *See, e.g.*, *American Mfg. Mut. Ins. Co. v. Tison Hog Market, Inc.*, 182 F.3d 1284, 1288 (11th Cir. 1999); *see also Aetna Indem. Co. v. City of Haverhill*, 142 F. 124, 124-25 (1st Cir. 1905) (noting that defendant below "conceded that a surety is liable on a bond which he has been induced to execute by the fraud of some person other than the obligee or his agents, but contended that where the bond is procured by the obligee, and the surety is induced to execute it by the fraud of some one acting in the obligee's behalf, then the surety is not bound"). There is no evidence here that Southern Worcester—which was the victim of the fraud—was aware of, or participated in, any false statements by Blanchette to Utica. The bonds accordingly are not voidable based on fraud or material misrepresentation.

### 3. Whether Plaintiff's Comparative Negligence Bars or Limits Recovery

Utica next contends that plaintiff had severe internal control weaknesses that contributed to Blanchette's ability to commit embezzlement. It argues that in an action based on a principal's negligent or fraudulent performance of a duty imposed by law, the surety may raise the comparative or contributory negligence of the obligee so as to reduce or defeat the recovery of damages.

It has long been held, however, that the issuer of a surety bond cannot escape its obligation by asserting that the principal whose performance was bonded was not sufficiently supervised. *See Inhabitants of Hudson v. Miles*, 185 Mass. 582, 587 (1904); *Watertown Fire Ins. Co. v. Simmons*, 131 Mass. 85, 86 (1881) ("[T]he creditor owes no duty of active diligence to take care of the interest of the surety. It is the business of the surety to see that his principal

11

performs the duty which he has guaranteed, and not that of the creditor."); *see also Danca*, 385 Mass. at 10 (stating generally that "'negligence' is not a defense to an action on a contract").

Although those cases are more than one hundred years old, they appear to be the settled law of the Commonwealth. Moreover, the rule makes considerable practical sense. In any situation where a bonded principal performs his duties negligently or fraudulently, it could arguably be said that his employer did not adequately supervise him (because negligence or fraud could not have occurred *with* adequate supervision). If that contention were sufficient to defeat or reduce a surety's liability, bonds would have little or no practical value to any potential obligee. Summary judgment for plaintiff accordingly may not be defeated on that basis.

### 4. <u>Whether There Was One "Continuous" Bond</u>

Finally, Utica contends that it issued only one "continuous" bond, and that therefore its maximum potential liability is $150,000. Thus, it asserts that the first document (in August 1992) established a $150,000 bond, and the seven subsequent documents (sent each year from 1993 to 1999) were mere renewals of the first bond. Plaintiff contends that the eight bond documents issued were separate and distinct bonds, each with a unique August-to-August one-year coverage period.

The first "public official bond" states that it was "signed, sealed and dated" on August 25, 1992. The document establishes the amount of defendant's potential liability: $150,000. It then says that the principal was "duly elected or appointed" to the "office or position" of Treasurer for "the term beginning August 18, 1992, and ending August 18, 1993." Blanchette's name was typed above the "Principal" signature line, although he did not sign the document. The seven successive bonds are identical in language and format to the first, and differ only as to the date

"signed, sealed and dated," the period in which Blanchette's term as Treasurer is represented to run, and the occasional absence of a Utica representative's signature. None of the seven documents make any reference to the renewal or continuation of any previous bond obligation. Plaintiff paid the same price—$525.00—each year for each of the eight bonds.

Under the circumstances, it is clear that Utica undertook eight separate obligations, not one single obligation capped at $150,000. It is well-established that unless a surety bond has clear and unambiguous language showing that a surety and an obligee intended to enter into a continuous contract, recovery is permitted up to the penalty amount of each separate bond document. *See, e.g.*, *In re Endeco, Inc.*, 718 F.2d 879, 880-82 (8th Cir. 1983); *United States v. American Sur. Co. of N.Y.*, 172 F.2d 135, 138 (2d Cir. 1949); *Standard Acc. Ins. Co. v. Collingdale State Bank*, 85 F.2d 375, 376 (3d Cir. 1936); *White Dairy Co. v. St. Paul Fire & Marine Ins. Co.*, 222 F. Supp. 1014, 1016-19 (N.D. Ala. 1963); *Aetna Cas. & Sur. Co. v. Commercial State Bank of Rantoul*, 13 F.2d 474, 476 (E.D. Ill. 1926), *rev'd on other grounds*, 19 F.2d 969 (7th Cir. 1927); *City of Middlesboro v. American Sur. Co. of N.Y.*, 307 Ky. 769, 772-75 (1948). No such language is present here.

Moreover, Utica's proffered interpretation of the bond documents would essentially result in plaintiff paying the *same* sum, every year, for steadily diminishing coverage. That is simply not a realistic construction, given practical business considerations. Indeed, several courts faced with similar issues have raised the following question: if an obligee pays multiple premiums for a single right of recovery, what did it buy the second year? *See United States v. American Surety*, 172 F.2d at 138 (citing *Aetna v. Commercial State Bank of Rantoul*, 13 F.2d at 476); *see also Collingdale*, 85 F.2d at 376 ("We are the more persuaded to this view by the improbability that a

practical business concern . . . would pay one company two premiums for a single right of recovery if it could by payment of the same sum to two separate insurance carriers procure recoverable insurance for two periods."); *City of Middlesboro*, 307 Ky. at 775 ("Can it then be justifiably argued that if [obligee] insures with the one company and renews with the same company its [per-year] protection is reduced . . . ?"). As the *Middlesboro* court recognized, this interpretation would mean that if "the limit of liability under the original bond [is reached] during the first year, the second year's renewal premium buys nothing." *Id.*; *see also White Dairy Co.*, 222 F. Supp. at 1016 ("[T]he problem of the [bond] draftsman is complicated by a choice of words which will, at the same time, attempt to confine the protection afforded to that for which the premium is fixed and charged without putting the insured on notice that it may obtain the coverage it requires by changing companies each year.").[7]

Each of the substantively-identical eight bond documents at issue stated that defendant was "held and firmly bound" unto plaintiff for the sum of $150,000. In the absence of any persuasive evidence that this language was a reiteration of the original 1992 obligation, and in light of the irrational commercial outcome that would otherwise result, the Court concludes that each document constitutes a separate bond and each exposes defendant to $150,000 in potential

---

[7] Arrangements to pay premiums indefinitely to recover a fixed and non-stacking sum are, of course, common to life insurance policies. But the nature of the harm guarded against, among other things, differentiates the contract here. In life insurance, the risk is the one-time-only event of the insured's death. Here, the risk is financial negligence or misconduct, a harm capable of repetition. Absent clear and unambiguous language to the contrary, the life insurance policy arrangement should not be imputed to bonds like those at issue here. *See United States v. American Surety*, 172 F.2d at 138 ("[T]he bond has been likened to a term life insurance policy, though the analogy seems unpersuasive; a man has only one life, while a [principal] may be guilty of many embezzlements.") (citation omitted).

liability for breaches occurring in the relevant date range.[8]

\*   \*   \*

In summary, Utica has pointed to no material issues of disputed fact that would preclude summary judgment as to Count 1, and all of its legal arguments against liability are unavailing. Accordingly, summary judgment as to Count 1 will be granted in favor of plaintiff as to liability.[9]

### B. Claim Under Mass. Gen. Laws ch. 93A

Plaintiff contends that Utica violated Mass. Gen. Laws ch. 93A, § 11 in two principal ways: (1) by refusing to pay the amount it acknowledged was due on one bond ($150,000) unless plaintiff waived its claim as to the others; and (2) by failing to make payment or otherwise effect a settlement once its liability was clear. Utica contends that the claim is barred by the statute of limitations, and that plaintiff improperly asserts claims under Mass. Gen. Laws ch. 176D in an action under ch. 93A.

#### 1. Whether the Claim Is Barred by the Statute of Limitations

Utica first contends that the chapter 93A claim is barred by the statute of limitations.

---

[8] Even if the bonds are susceptible to two reasonable interpretations, the fact that the bond language was drafted by defendant also supports this result. *See McAdams v. Mass. Mutual Life Ins. Co.*, 391 F.3d 287, 297 (1st Cir. 2004) (noting district court's invocation of "the principle that ambiguous [contract] language is to be construed against the drafter"); *Merchants Ins. Co. of N.H., Inc. v. U.S. Fid. and Guar. Co.*, 143 F.3d 5, 8 (1st Cir. 1998) (applying the principle that, under Massachusetts law, when insurance policy provisions permit more than one rational interpretation, "the reading most favorable to the insured must prevail"); *Hakim v. Massachusetts Insurers' Insolvency Fund*, 424 Mass. 275, 281-82 (1997) (same).

[9] Utica asserts that plaintiff's accounting firm did not produce any checks or bank statements to support plaintiff's claims as to the bonds for the years 1992-1993, 1993-1994, and 1994-1995. Plaintiff's accounting firm has attested, however, that it has records of checks and bank statements for this period, and plaintiff contends that all records requested by Utica's accountants were made available for review.

This issue appears to relate to the amount of damages claimed by plaintiff as to each period, not Utica's liability under the bonds. If, of course, those damages in fact prove to be zero, plaintiff cannot recover as to that particular bond. The Court's order granting summary judgment as to liability on each bond will be subject to modification if, in fact, plaintiff is unable to prove any damages as to a particular bond.

Claims brought under chapter 93A must be commenced within four years after the cause of action accrues. Mass. Gen. Laws ch. 93A, § 5A. A cause of action under chapter 93A generally accrues when a plaintiff knows, or reasonably should have known, of the injury attributable to defendant's conduct. *See, e.g.*, *Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 994 (1st Cir. 1998).

Under Massachusetts law, however, a claim under chapter 93A arising out of a breach of insurance policy that "rests on essentially the same alleged misconduct" as the breach does not accrue until the insurer "unequivocally and finally" rejects the plaintiff's position. *Nortek*, 65 Mass. App. Ct. at 770. Again, there is no reason, in this context, to distinguish a claim on a surety bond from a claim on an insurance policy. Because Utica did not "unequivocally and finally" reject plaintiff's position until October 2005, and plaintiff filed the complaint in September 2006, the filing was well within the four-year limitations period. The chapter 93A claim is, therefore, not time-barred.

### 2.     **Whether the Claim Is Improperly Based on Chapter 176D**

Utica next contends that the chapter 93A claim is improperly based on alleged violations of chapter 176D, and therefore must fail. Mass. Gen. Laws ch. 176D prohibits certain unfair acts by insurers related to the investigation, settlement, and payment of claims. Chapter 176D does not create a private cause of action and is enforceable only by the state commissioner of insurance. *See, e.g.*, *Metropolitan Prop. and Cas. Ins. Co. v. Boston Reg. Physical Therapy, Inc.*, 538 F. Supp. 2d 338, 343 (D. Mass. 2008) (quoting *Thorpe v. Mut. of Omaha Ins. Co.*, 984 F.2d 541, 544 n.1 (1st Cir. 1993)).

Claims under chapter 93A, however, may be based on conduct that also violates chapter

176D.  *See, e.g.*, *Continental Ins. Co. v. Bahnan*, 216 F.3d 150, 157 (1st Cir. 2000) ("[C]onduct that abridges [ch. 176D] may or may not abridge [ch. 93A]."); *Brazas Sporting Arms, Inc. v. American Empire Surplus*, 220 F.3d 1, 9 (1st Cir. 2000); *Kiewit Const. Co. v. Westchester Fire Ins. Co.*, 878 F. Supp. 298, 302 (D. Mass. 1995) ("There is thus no merit to the position . . . that a commercial plaintiff may not bring suit against an insurance company under Sections 2 and 11 of 93A for engaging in conduct that also happens to violate 176D."); *M. DeMatteo Constr. Co. v. Century Indem. Co.*, 182 F. Supp. 2d 146, 162 (D. Mass. 2001).

Various acts or practices of insurers, such as the failure of an insurer to settle a claim promptly when liability under a contract has become "reasonably clear," can constitute unfair acts or practices under chapter 93A.  *See, e.g.*, *Federal Ins. Co. v. HPSC, Inc.*, 480 F.3d 26, 34-35 (1st Cir. 2007) (citing Mass. Gen. Laws ch. 176D, § 3(9)(f)).  However, an insurer is not in violation of chapter 93A if it denies coverage, in good faith, on a "reasonable or plausible" interpretation of a contract.  *See, e.g.*, *HPSC*, 480 F.3d at 36 ("A plausible, reasoned legal position that may ultimately turn out to be mistaken . . . is outside the scope of the punitive aspects of the combined application of c. 93A and c. 176D."); *Peterborough Oil Co., Inc. v. Great American Ins. Co.*, 397 F. Supp. 2d 230, 244-45 (D. Mass. 2005).  But, an absence of good faith "[can] support[] [an] unfair settlement practice determination, even in the face of a plausible coverage position." *HPSC*, 480 F.3d at 36.

Accordingly, plaintiff's claim under chapter 93A is not defective because it is based on conduct that also violates chapter 176D, and summary judgment will not be granted in favor of Utica on that basis.  Conversely, because there are material issues of disputed fact as to whether Utica acted in good faith, summary judgment will not be granted for plaintiffs.

### III. <u>Conclusion</u>

For the foregoing reasons, plaintiff's motion for summary judgment is GRANTED as to liability on Count 1 and DENIED as to Count 2.  Defendant's motion for summary judgment is DENIED.

**So Ordered.**

                                                 /s/ F. Dennis Saylor
                                                F. Dennis Saylor IV
Dated: September 16, 2008                     United States District Judge