UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
SOUTHERN WORCESTER COUNTY                           )
REGIONAL VOCATIONAL SCHOOL                          )
DISTRICT,                                           )
                                                    )        **Civil Action No.**
              Plaintiff,                            )        **06-40230-FDS**
                                                    )
       v.                                           )
                                                    )
UTICA MUTUAL INSURANCE                              )
COMPANY,                                            )
                                                    )
              Defendant.                            )
_____)
-

FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR JUDGMENT

**SAYLOR, J.**

        This is an action seeking to recover on a series of public official bonds.  Plaintiff Southern

Worcester County Regional Vocational School District contends that defendant Utica Mutual

Insurance Company failed to honor a series of public official bonds in the wake of a massive

embezzlement by a school district employee.  The District brought claims for breach of contract

and unfair and deceptive acts and practices in violation of Mass. Gen. Laws ch. 93A, § 11 and

Mass. Gen. Laws ch. 176D, § 3.

        The claim for breach of contract was resolved by the Court in favor of the District on

summary judgment.  The claim under Chapter 93A was tried to the Court in a bench trial on

October 14, 2009.

        In connection with the Chapter 93A claim, Utica Mutual filed a motion pursuant to

Federal Rule of Civil Procedure 52(c) for judgment on partial findings on the grounds that (1)

Utica Mutual has paid the District its entire damages on the contract claim, which should

therefore be dismissed; (2) the District's claims under Chapter 93A are time-barred; and (3) the

District's failure to offer expert testimony in support of its Chapter 93A claim precludes recovery.


As to the first point, it appears undisputed that the contract damages have indeed been

paid in full without statutory interest.  Count 1 therefore appears to have been rendered moot and

will be dismissed.  The second point, concerning the statute of limitations, is addressed below in

the body of this memorandum.

As to the third point, Utica Mutual contends that expert testimony was essential to prove

a violation of insurance industry customs and standards.  The Court disagrees.  Expert testimony

may be necessary under some circumstances to establish that an insurer has breached a relevant

duty or standard of care or to help determine whether an insurer acted in good faith.  *See, e.g.,*

*Peckham v. Continental Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir. 1990); *Hartford Cas. Ins. Co.*

*v. New Hampshire Ins. Co.*, 417 Mass. 115, 119-20 (1994).  Here, however, the Court does not

find expert testimony to be required to resolve the issues presented in this matter, which are

relatively simple and straightforward.  To that extent, therefore, the motion for judgment will be

denied.

For the reasons that follow, the Court finds that Utica Mutual violated Mass. Gen. Laws

ch. 93A, and will award the District its attorneys' fees and costs.

I.    **FINDINGS OF FACT**

      A.      **The District and Paul Blanchette**

1.    Southern Worcester County Regional Vocational School District (the "District") is a regional vocational district serving several Massachusetts towns.  (Revised Local Rule 16.5(D) Joint Pretrial Memorandum ("RJPM") ¶ 1).

2.    Paul Blanchette, an accountant, was hired by the District in March 1976 as its Business Manager.   (*Id.* ¶ 2).

3.    As of 1990, Blanchette was the Assistant Superintendent of Business for the District.

4.    In August 1990, the Treasurer of the District, Robert Patrowicz, died.  On August 20, the School Committee voted the following, as reflected in the minutes of the meeting:

> APPOINTMENT OF TREASURER—As requested by the Chairman,
>
> * * *
>
> A MOTION was made by Robert H. Hill that the Treasurer's position be eliminated and that the duties and responsibilities under the position of Treasurer be incorporated with the duties of the Assistant Superintendent of Business and further that a one-time $2,000 increase in salary be added for these duties.  Seconded by Dr. Rene J. Hamel.
>
> After discussion regarding combining the two positions, and a brief explanation of the procedures followed within his office, it was
>
> VOTED:      For:  5      Opposed:  2

(*Id.* ¶ 3).

5.    Blanchette continued to serve as Assistant Superintendent of Business after the

vote.  He also performed the duties that were previously performed by Patrowicz. Those duties included signing notes for loans, transferring funds among accounts, signing checks, reconciling bank statements, and otherwise authorizing, recording, and verifying the financial transactions of the District.

**B.    The Public Official Bonds**

6.    Utica Mutual Insurance Company is an insurance company duly licensed to operate in Massachusetts, with a principal place of business in New Hartford, New York.  (Complaint ¶ 3; Answer ¶ 3).

7.    On August 25, 1992, an agent for Utica Mutual, G.M. Abodeely, received an application for issuance of a public official's bond in favor of the District in the penal sum of $150,000 covering the performance of Blanchette as Treasurer of the District.  (RJPM ¶ 5).

8.    The application indicated that Blanchette had been appointed to the position of Treasurer on August 18, 1990, that the District's accounts were examined on an annual basis, and that the accounts recently had been examined and were in order. (Ex. 2).

9.    On August 27, 1992, Utica Mutual's agent issued Public Official Bond No. SU1559050 to the District.  The bond was in the penal sum of $150,000 for the term beginning August 18, 1992, and ending August 18, 1993.  (RJPM ¶ 6; Ex. 1).

10.    The bond stated that Utica (the surety) and Blanchette (the principal) jointly and severally bound themselves to the District (the obligee) to pay the penal sum of $150,000 if the principal failed to "well and truly perform all the duties of his said

4

office or position, and account for all funds coming into his hands by virtue of his said office or position as required by law." (Ex. 1). The bond also specifically stated that Blanchette was "duly elected or appointed to the office or position of 'Treasurer of Southern Worc. County Reg. Voc. School' for the term beginning 'August 18, 1992' and ending 'August 18, 1993.'" (*Id.*).

11. Utica Mutual also issued bonds to the District for the years 1993-1994, 1994-1995, 1995-1996, 1996-1997, 1997-1998, and 1999-2000. (*Id.*). All of the bonds were identical in format and language to the first, except that each specified a distinct term for which Blanchette was appointed to the office of Treasurer. (*Id.*). All of the bonds were labeled with the same bond number, Public Official Bond No. SU1559050. (*Id.*).

12. The District paid a $525 premium to Utica Mutual in each year from 1992 to 1999.

**C.     Blanchette's Embezzlement**

13. Beginning at least as early as August 1990, and until his resignation in January 2000, Blanchette embezzled more than $5 million from the District. (RJPM ¶ 14). He wrote checks to himself from District bank accounts, which he signed as Treasurer of the District. To conceal these losses and replenish the accounts, Blanchette took out various loans in the name of the District. He also forged annual audit reports that appeared to be from an independent auditor, and submitted those reports to federal agencies from which the District received funding and to banks from which it received loans. Blanchette also submitted false

monthly financial statements to the School Committee.

14.     On January 15, 2000, the District was put on notice of facts suggesting that

        Blanchette had embezzled funds from its accounts.  (*Id.* ¶ 8).

15.     On January 26, 2000, Blanchette resigned from his position with the District.

        (*Id.* ¶ 9).

16.     On September 10, 2001, Blanchette pleaded guilty in the United States District

        Court to embezzlement charges.  He was eventually sentenced to prison.

        (*Id.* ¶ 14).

**D.     The District's Notice to Utica Mutual and the Accounting Investigations**

17.     On February 15, 2000, the District notified Utica Mutual of its intent to submit a

        claim under the bonds.  It notified Utica Mutual of Blanchette's resignation and of

        the fact that Blanchette had embezzled funds from the District during the period

        covered by the bonds Utica Mutual had issued to the District.  (*Id.* ¶ 10).

18.     The District also notified Utica Mutual that it had retained an outside auditing

        firm, Melanson Heath & Company, P.C., to conduct an investigation of the losses

        that it had incurred from the embezzlement.  It also notified Utica Mutual that the

        Worcester County District Attorney's Office was conducting an investigation into

        the embezzlement.  (*Id.*).

19.     Melanson Heath issued a report to the District, dated March 30, 2000, that

        concluded that the losses the District incurred from Blanchette's embezzlement

        exceeded $150,000 in each of the eight years covered by the Utica Mutual bonds.

        (Ex. 3).

20.     By letter dated April 18, 2000, Utica Mutual acknowledged receipt of the
        District's February 15, 2000 notice of claim, and notified the District that Utica
        Mutual would conduct its own investigation pursuant to a reservation of rights.
        (RJPM ¶ 11; Ex. 4).

21.     On January 17, 2001, the District forwarded Utica Mutual a copy of the March 30
        report prepared by Melanson Heath.  (RJPM ¶ 12).

22.     Utica Mutual hired the accounting firm of Magnan Graizzaro & Associates to
        investigate the claim.

23.     On April 6, 2001, Magnan Graizzaro issued a report to Utica Mutual of its
        investigation.  The Magnan Graizzaro report confirmed that Blanchette had
        embezzled from the District more than $150,000 in each of the periods 1995-1996,
        1996-1997, 1997-1998, 1998-1999, and 1999-2000.  (*Id.* ¶ 13; Ex. 5).

24.     The Magnan Graizzaro report stated that it was unable to confirm the amounts
        that Blanchette embezzled in each of the bond periods 1992-1993, 1993-1994, and
        1994-1995.   (Ex. 5).  The reason given was that the District's accounting firm,
        Melanson Heath, had, prior to Magnan Graizzaro's examination, surrendered to
        law enforcement officials the original records that showed the District's losses for
        those years.  (*Id.*).

25.     In its April 6, 2001 report, Magnan Graizzaro stated that it left the amount of the
        District's losses in those three bond years "for your [i.e., Utica Mutual's]
        determination."  (*Id.*).

**E.      Communications in October 2001**

26.     There is no evidence of any communications between the District and Utica
        Mutual from January 17, 2001, to October 2, 2001.

27.     On October 2, 2001, the District's counsel sent a letter to James Donovan, a
        Senior Claims Specialist at Utica Mutual.  (Ex. 6).

28.     The October 2 letter requested payment of $150,000 on each of the eight bonds
        Utica Mutual had issued to the District, or $1.2 million.  (RJPM ¶ 15; Ex. 6).

29.     The October 2 letter stated that the District had not "received any indication"
        whether Utica Mutual took the position that it owed the District a single bond
        payment of $150,000, or multiple bond payments of $150,000 each.  (Ex. 6; Tr.
        41).

30.     The October 2 letter requested a "detailed explanation" of Utica Mutual's position
        if the insurer denied that it owed the District multiple bond payments.  (Ex. 6; Tr.
        42).

31.     The October 2 letter asserted that it would be a violation of Mass. Gen. Laws chs.
        93A and 176D for Utica Mutual to deny that it owed the District multiple bond
        payments.  (Ex. 6; Tr. 42).

32.     The October 2 letter stated that even if Utica Mutual did not agree that it owed the
        District multiple bond payments, Utica Mutual should pay the District the amount
        that it did agree that it owed the District.  (Ex. 6; Tr. 42).

33.     In response to the October 2 letter, Donovan consulted with his supervisor, Edith
        Schultz, and his home office supervisor, Jim Galpin, concerning the amount to be
        paid to the District on the bonds.  (Tr. 33, 36-37).

8

34.    Galpin authorized Donovan to pay the District a "single limit" of $150,000.  (Tr. 38).

35.    On October 18, 2001, Donovan sent a letter to the District's counsel acknowledging that Utica Mutual was liable to the District, but that liability was limited to a single payment of $150,000.  (RJPM ¶ 16; Ex. 7; Tr. 46).

36.    In the October 18 letter, Donovan did not reserve any rights on behalf of Utica Mutual not to pay the amount it agreed it owed to the District.  (Tr. 49).

37.    The only explanation in the October 18 letter as to Utica Mutual's position was that "[t]he actions by our principal [i.e., Blanchette] constitute a single claim, which occurred over a continuous period of time."  (Ex. 7; Tr. 46).

38.    With the October 18 letter, Donovan enclosed a proof of loss form.   (RJPM ¶ 16; Ex. 7; Tr. 47).

39.    The proof of loss form stated:  "The Insured agrees by way of compromise to accept the sum of _____ *in full payment, satisfaction and settlement of all claims and demands against The Company under the **above numbered policy**, arising from or connected* with such loss or damage to property described above under the above numbered policy."  (Ex. 7 (italics in original, bolding added)).

40.    The policy number at the top of the proof of loss form that Mr. Donovan enclosed with his October 18, 2001 letter was 1559050.  (*Id.*).

41.    Each of the eight bonds issued to the District by Utica Mutual were labeled with the same bond number, 1559050.  (RJPM ¶ 7; Ex. 1; Tr. 74, 75).

42.    Donovan handwrote the number $150,000 on the form, and indicated with an "X"

that Donovan wished the District to execute the subrogation agreement contained in the form. (Tr. 70-71).

43. It was reasonable for the District to conclude, based on the letter and proof of loss form, and the fact that the proof of loss form referred to a policy number that was applicable to all eight bonds, that it was Utica Mutual's position that it would only pay the District the $150,000 that it admitted it owed on the condition that the District waive its rights to assert its claim that it was entitled to recover additional amounts on the multiple bonds that Utica Mutual had issued to the District.

44. The District did not submit an executed proof of loss form to Utica Mutual as requested.

**F.   Communications in May 2002**

45. There is no evidence of any communications between the District and Utica Mutual from October 18, 2001, to May 17, 2002.

46. On May 17, 2002, the District's counsel sent a further letter to Utica Mutual. The letter characterized the proof of loss form as requiring it to "release Utica from all claims arising under the bonds before Utica will pay the District the $150,000 that Utica acknowledges the District is owed." It again raised the issue of a potential violation of Mass. Gen. Laws ch. 93A and ch. 176D, and demanded that Utica Mutual make payment of $150,000 within thirty days. (RJPM ¶ 17; Ex. 8; Tr. 50).

47. Utica Mutual did not respond in writing to the May 17 letter alleging that it was improperly conditioning payment of an admitted liability on the District waiving its rights to claim additional payments.

10

48.   Donovan testified that he "believe[d]" that he spoke to the District's counsel by telephone and told her that she was not correct in asserting that Utica Mutual would require the District to waive its rights to seek additional payments if it accepted a payment of a single bond amount from Utica Mutual.  Donovan could not, however, testify that he was certain he had done so, and could not recall that he had.  (Tr. 49-51, 75, 76).

49.   Donovan did not create any written memorialization of any such telephone conversation.  (Tr. 76).

**G.     Communications in December 2002**

50.   At some point, Utica Mutual referred the District's claim to Richard Wholley as outside counsel.  (Tr. 52, 55).

51.   On December 20, 2002, Wholley sent Anne Robbins, counsel for the District, a letter that stated that "we can work out language with respect to the $150,000 claim under the bond *that should be paid at this time*.  I am sure we can work out agreeable language with respect to that amount and get that claim resolved."  (Ex. 9 (italics added)).

52.   The letter also confirmed that Robbins was on trial, and that she would contact Wholley at the conclusion of the trial.

**H.     Communications in December 2003 and January 2004**

53.   There is no evidence of any communications between the District and Utica Mutual from December 20, 2002, to December 2003.

54.   In December 2003, counsel for the District sent Wholley a draft demand letter

pursuant to Mass. Gen. Laws ch. 93A.  (*See* Ex. 10).  The draft demand letter is

not, however, part of the record.

55.    On January 20, 2004, David J. Daly, new counsel for Utica Mutual, wrote to

Jeffrey Swope, new counsel for the District.  (*Id.*).

56.    The January 20 letter from Daly stated that "we are concerned that Utica's

position regarding the District's claim under the public official bond needs to be

clarified. . . .  Utica is willing to settle [the] claim for $150,000 subject to an

appropriate release."  The letter also expressly stated that the offer of $150,000

was for settlement purposes only and Utica did not "acknowledge[] the District is

owed that amount."  (*Id.*).

57.    In the January 20 letter, Daly stated that Utica Mutual's position was "subject to

modification" once questions and issues he identified in that letter were addressed,

and he asked counsel for the District to provide additional information that

supported the draft Chapter 93A letter counsel for the District had sent to

Wholley.  (*Id.*).

58.    On January 23, 2004, counsel for Utica Mutual requested certain additional

information from the District.  (*See* Ex. 11).

**I.    Communications in April and August 2004**

59.    On April 20, 2004, counsel for Utica Mutual requested certain additional

documents from the District.  (*See id.*).

60.    By letter dated August 11, 2004, counsel for Utica Mutual again sought additional

documents from the District, and stated that once he had received them, Utica

12

Mutual "[would] be in a position to discuss resolution of this matter." (*Id.*).

**J.       Communications in October 2005**

61.     By letter dated October 21, 2005, Daly advised counsel for the District that Utica

        Mutual denied liability on the eight bonds above $150,000.  (Ex. 13).  The letter

        stated that Utica Mutual "reiterates its settlement offer of $150,000, the penal sum

        of the only applicable Bond, subject to reaching agreement with the District on the

        terms and conditions of settlement, including a release by the District of all claims

        related to the Bond." (*Id.*).  The letter also states that the settlement offer would

        be open for two weeks, after which "the offer will be withdrawn and the claim

        denied in its entirety." (*Id.*).

62.     In the October 21, 2005 letter, Utica Mutual stated it had finally concluded its

        investigation, and the results "fully support denial of the District's claim." (*Id.*).

63.     The letter cited several reasons that Utica Mutual had not previously asserted as

        grounds to deny payment on all eight of the bonds.  (*Id.*).

64.     Utica Mutual denied liability (1) because the bond application allegedly contained

        intentional misrepresentations; (2) because the District had failed to provide

        oversight of the activities of Blanchette; and (3) because the position of Treasurer

        that was covered by the bonds had allegedly been abolished by the District before

        Utica Mutual issued bonds that covered that position.  (*Id.*).

65.     In his October 18, 2001 letter, Donovan had not asserted any of those reasons for

        denying liability, and had not reserved any rights on behalf of Utica Mutual not to

        pay the District amounts that Utica Mutual owed to the District.  (Tr. 49).

**K.**     **Communications in 2006**

66.     There is no evidence of any communications between the District and Utica

        Mutual from October 24, 2005, to May 8, 2006.

67.     By letter dated May 8, 2006, counsel for the District sent Utica Mutual a demand

        letter pursuant to Mass. Gen. Laws ch. 93A.  (Ex. 15).  The letter demanded

        payment totaling $1.2 million for the embezzlement of Blanchette over the eight

        years covered by the eight bonds for $150,000 each that Utica Mutual had issued

        to the District to cover the position of Treasurer.  (*Id.*).

68.     By letter dated June 5, 2006, Daly, on behalf of Utica Mutual, responded and

        denied liability.  (Ex. 16).

**L.**     **The Litigation**

69.     This action was filed on September 29, 2006.  (RJPM ¶ 18).

70.     On September 16, 2008, this Court issued its Memorandum and Order on Cross-

        Motions for Summary Judgment, granting summary judgment to the District on

        Utica Mutual's liability on all eight bonds and denying summary judgment to Utica

        Mutual.  (Doc. 30).

**M.**     **Developments after the Lawsuit**

71.     On December 29, 2008, new counsel for Utica Mutual sent to counsel for the

        District five separate checks, each in the amount of $207,402.74, payable to the

        District.  Each check represented payment of the $150,000 penal sum of each of

        the five bond periods 1995-1996, 1996-1997, 1997-1998, 1998-1999, and 1999-

        2000, plus full statutory interest from the date (October 21, 2005) determined by

this Court as the date of Utica Mutual's breach of contract.  (RJPM ¶ 21; Ex. 17).

The District cashed the five checks.  (RJPM ¶ 21).

72.     The December 29, 2008 letter transmitting the checks for the five bond periods

        1995-1996, 1996-1997, 1997-1998, 1998-1999, and 1999-2000, stated that Utica

        Mutual required the District to submit additional information in order to recover

        for its losses from Blanchette's embezzlements in the 1992-1993, 1993-1994, and

        1994-1995 bond years.  (Ex. 17).

73.     On March 5, 2009, the parties appeared before the Court for a pretrial conference.

74.     At the conference, the District's counsel agreed that the issue of whether the

        District had losses in excess of $150,000 on the first three bonds was "a factual

        issue for which the jury's determination will be necessary."  (Tr., PTC at 4).

75.     The Court allowed the District 45 days to locate and produce documents

        substantiating its losses.  (Tr., PTC at 10).  The Court also set a schedule for any

        motions *in limine* that the parties intended to file with respect to the District's

        ability to prove its losses under the first three bonds.  (Tr., PTC at 12).

76.     On April 17, 2009, the District reported to the Court that additional documents

        had been located at a federal archives facility in Waltham, Massachusetts.  (Doc.

        No. 49).

77.     On April 24, 2009, the parties jointly moved to postpone the motions *in limine*

        deadlines to allow the parties sufficient time to review and evaluate the newly-

        located documents.  (Doc. No. 51).

78.     According to the affidavit filed by Assistant United States Attorney Paul G.

Levenson, the newly-located documents initially had been obtained from Fleet

Bank in or about November 2000 pursuant to a federal grand jury subpoena. (Ex.

20). The subpoena had requested all records pertaining to the Fleet Bank account

that Blanchette had used as the primary vehicle for his embezzlement. (*Id.*). Upon

conclusion of the criminal case, all of the Fleet Bank documents were sent to the

federal archives facility in Waltham for storage. (*Id.*).

79. According to the affidavit filed by Phillip Hall, Asset Forfeiture Coordinator for

the Boston Field Office of the Internal Revenue Service, all of the records obtained

from Fleet Bank were provided to the District's counsel in May 2009. (Ex. 21).

These records contained photocopies of all of the checks produced by Fleet Bank

for the 1992-1995 time period. (*Id.*).

80. On May 13 2009, Utica Mutual's counsel submitted the records to James

DiChaira, the accountant who had, while a partner at Magnan Graizzaro in 2001,

reviewed the information provided by the District concerning the embezzlement.

(Ex. 19).

81. DiChaira's examination of the records indicated that the verifiable losses incurred

by the District for the 1992-1993 bond year were $12,303.40; for the 1993-1994

bond year were in excess of $150,000; and for the 1994-1995 bond year were

$62,744.50. (*Id.*).

82. On May 19, 2009, counsel for the District advised counsel for Utica Mutual that it

would be an unfair claims settlement practice to deny payment to the District of

$150,000 for each of the 1992-1993, 1993-1994, and 1994-1995 bond years based

16

upon an assertion by Utica Mutual that the District had not supplied sufficient evidence of its losses in excess of $150,000 in each of those years. (Ex. 18). Counsel for the District stated that Utica Mutual had not advised the District of its need for such records at the time of its examination of its losses, when the District could have taken steps to retrieve such records. (*Id.*).

83.   On June 24, 2009, counsel for Utica Mutual sent to counsel for the District a check in the amount of $216,131.50, representing payment of the $150,000 penal sum of the bond issued for 1993-1994, plus full statutory interest from the date (October 21, 2005) determined by this Court as the date of Utica Mutual's breach of contract. (RJPM ¶ 22; Ex. 22).

84.   In his June 24, 2009 letter transmitting the check, counsel for Utica Mutual acknowledged that Utica Mutual's accountant had verified the District's losses of $12,303.40 for the 1992-1993 bond year and $62,744.50 for the 1994-1995 bond year, and stated that Utica Mutual would pay those amounts, plus interest, to the District, but only if it accepted those partial payments "as full and final settlement of the claims against those two bonds," other than the District's Chapter 93A claims. (Ex. 22).

85.   By letter dated July 1, 2009, counsel for the District notified counsel for Utica Mutual that the District would consider it a further violation of Chapters 93A and 176D for Utica Mutual to insist that the District waive its right to seek additional amounts due it under the 1992-1993 and 1994-1995 bonds as a precondition for receiving payments on those two bonds that Utica Mutual admitted it owed the

District.  (Ex. 23).

86.    On August 14, 2009, counsel for Utica Mutual sent to counsel for the District two

separate checks, each in the amount of $218,647.00, payable to the District.  Each

check represented a payment of the $150,000 penal sum of each of the bonds

issued for 1992-1993 and 1993-1994, plus full statutory interest from the date

(October 21, 2005) determined by this Court as the date of Utica Mutual's breach

of contract.  (RJPM ¶ 23; Ex. 28).

## II.    <u>CONCLUSIONS OF LAW</u>

87.    The District contends that Utica Mutual violated Mass. Gen. Laws ch. 93A, § 11

in six ways:

       (1)    by "requiring the District to waive its rights to pursue additional

recoveries" on all eight bonds in order "to receive payment of the

$150,000 that Utica Mutual admitted it owed to the District";

       (2)    by "first agreeing that it owed the District $150,000, and

subsequently denying that it had so agreed and asserting that it

owed the District nothing";

       (3)    by "reversing its position on its liability to pay $150,000 to the

District in order to avoid potential liability for having violated

Chapter 93A" based on its demand for a waiver;

       (4)    by "changing the reasons it gave the District for not paying on the

bonds";

       (5)    by "not asserting until 2009 [*sic*] its demand for proof of the

District's losses" as to certain years; and

(6)      by "asserting defenses without merit" to the District's claims.

(Pl. Prop. Concl. Law ¶¶ 5, 11, 12, 13, 16, 20).

A.      **Principles of Law**

1.      **Chapter 93A Generally**

88.      Chapter 93A creates a right of action for "unfair . . . acts or practices in the

conduct of any trade or commerce" that are suffered by an entity engaged in the

conduct of any trade or commerce.  Mass. Gen. Laws ch. 93A, §§ 2(a), 11.

89.      To prevail on a claim under Chapter 93A, the plaintiff must prove conduct that

falls "within at least the penumbra of some common-law, statutory, or other

established concept or unfairness."  *Lambert v. Fleet Nat'l Bank*, 449 Mass. 119,

127 (2007) (quotation omitted).

90.      "[I]t is well settled that a simple breach of contract is never enough, by itself, to

constitute a violation of Chapter 93A."  *Trent Partners & Assocs., Inc. v. Digital

Equip. Corp.*, 120 F. Supp. 2d 84, 106 (D. Mass. 1999) (citing *Pepsi-Cola Metro.

Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir. 1985)); *see also

Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 100-01 (1979).

91.      A party may be held liable under Chapter 93A for conduct that occurs during

litigation even though the litigation itself asserts Chapter 93A liability based on

actions that occurred before the litigation was commenced.  *Commercial Union

Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 41 n.5 (1st Cir. 2000).

92.      In addition to "actual damages," Mass. Gen. Laws ch. 93A, § 11 provides for

19

double or treble damages in the event of a "willful or knowing" violation of the

statute.

93. Mass. Gen. Laws ch. 93A, § 11 also provides for an award of "reasonable

attorneys' fees and costs incurred" in litigating the action.

94. The parties do not dispute that they are "engaged in the conduct of trade or

commerce" within the meaning of Chapter 93A, § 11.

### 2. Chapter 176D

95. Mass. Gen. Laws ch. 176D prohibits certain unfair acts by insurers related to the

investigation, settlement, and payment of claims.  Chapter 176D does not create a

private cause of action and is enforceable only by the state commissioner of

insurance.  *See, e.g., Metro. Prop. & Cas. Ins. Co. v. Boston Reg'l Physical*

*Therapy, Inc.*, 538 F. Supp. 2d 338, 343 (D. Mass. 2008).

96. Claims under Chapter 93A, however, may be based on conduct that also violates

Chapter 176D.  *Continental Ins. Co. v. Bahnan*, 216 F.3d 150, 157 (1st Cir. 2000)

("[C]onduct that abridges [ch. 176D] may or may not abridge [ch. 93A]"); *see,*

*e.g.*, *Brazas Sporting Arms, Inc. v. Am. Empire Surplus Line Ins. Co.*, 220 F.3d 1,

9 (1st Cir. 2000); *M. DeMatteo Constr. Co. v. Century Indem. Co.*, 182 F. Supp.

2d 146, 162 (D. Mass. 2001); *Kiewit Constr. Co v. Westchester Fire Ins. Co.*, 878

F. Supp. 298, 302 (D. Mass. 1995).

### 3. Reasonable or Plausible Interpretations of Policies

97. An insurer does not violate Chapter 93A if it denies coverage, in good faith, based

on a "reasonable or plausible" interpretation of a contract.  *See, e.g., Peterborough*

*Oil Co. v. Great Am. Ins. Co.*, 397 F. Supp. 2d 230, 244-45 (D. Mass. 2005);

*Guity v. Commerce Ins. Co.*, 36 Mass. App. Ct. 339, 343 (1994) ("A plausible,

reasoned legal position that may ultimately turn out to be mistaken -- or

simply . . . unsuccessful -- is outside the scope of the punitive aspects of the

combined application of c. 93A and c. 176D").

98.     In a case involving complex issues of law or fact, "it would be grossly unfair to

bring down the potent weaponry of chapter 93A upon one who may guess

wrongly about what a court will ultimately do with the problem." *Waste Mgmt. of*

*Mass., Inc. v. Carver*, 37 Mass. App. Ct. 694, 699-700 (1994) (quotation

omitted).

### 4.     Extortionate and Coercive Conduct Generally

99.     As a general matter, insurers violate Chapter 93A if they engage in conduct that is

extortionate, coercive, or intended to cause delay.  *See Commercial Union*, 217

F.3d at 40; *Guity*, 36 Mass. App. Ct. at 344 ("An absence of good faith and the

presence of extortionate tactics generally characterize the basis for c. 93A-176D

action based on unfair claims settlement practice.").

100.    A "coercive insistence" by an insurer that an insured sign an agreement not

required by the terms of a contract of insurance, as a condition to the insurer

complying with its contractual obligations, may constitute an unfair practice within

the meaning of Chapter 93A.  *Siegel v. Berkshire Life Ins. Co.*, 64 Mass App. Ct.

698, 702 (2005).

101.    An insurer's actions in offering shifting or inconsistent reasons for not paying a

claim may constitute an unfair practice within in the meaning of Chapter 93A.

*Fed. Ins. Co. v. HPSC, Inc.*, 480 F.3d 26, 36 (1st Cir. 2007); *Commercial Union*,

217 F.3d at 41-43.

102.   The possession of a plausible defense to a coverage claim does not automatically

preclude a finding of Chapter 93A violation.  *Commercial Union*, 217 F.3d at 40-

41.  The defense, however, "must be clearly articulated and asserted in good faith."

*Id.*

   **5.**       **Insurer's Duty to Effectuate Prompt Settlement**

103.   Mass. Gen. Laws ch. 176D, § 3(9)(f), imposes on insurers a duty to "effectuate

prompt, fair and equitable settlement[] of [a] claim[] in which liability has become

reasonably clear."

104.   Liability has become "reasonably clear" under § 3(9)(f) when "a reasonable person,

with knowledge of the relevant facts and law, would probably have concluded, for

good reason, that the insurer was liable to the plaintiff."  *Fed. Ins. Co*, 480 F.3d at

36 (quotation omitted).

105.   The test for when liability becomes "reasonably clear" is objective, not subjective,

and is based on an inquiry into the facts and applicable law.  *Demeo v. State Farm

Mut. Auto. Ins. Co.*, 38 Mass. App. Ct. 955, 956 (1995).

106.   The insurer's obligation concerning settlement is principally an obligation to act in

"good faith."  *See Hartford Cas.*, 417 Mass. at 118.  "[A] negligent failure to settle

when a reasonably prudent insurer, exercising due care, would have settled would

not be enough."  *Id.*

22

107.    An absence of good faith "[can] support [] [an] unfair settlement practice

determination, even in the face of a plausible coverage position." *Fed. Ins. Co.*,

480 F.3d at 36.

108.    "The test is not whether a reasonable insurer might have settled a case within the

policy limits, but rather whether no reasonable insurer would have failed to settle

the case within the policy limits." *Hartford Cas.*, 417 Mass. at 121.

### 6.    Insurer's Duty to Refrain from "Low-Balling"

109.    Mass. Gen. Laws ch. 176D, § 3(9)(g), prohibits insurers from "[c]ompelling

insureds to institute litigation to recover amounts due under an insurance policy by

offering substantially less than the amounts ultimately recovered in [an] action[]

brought by such insureds."

110.    The purpose of § 3(9)(g) is to "penalize the practice of 'low-balling,' *i.e.*, offering

much less than a case is worth in a situation where liability is either clear or highly

likely." *R.W. Granger & Sons, Inc. v. J&S Insulation, Inc.*, 435 Mass. 66, 77

(2001) (quoting *Guity*, 36 Mass. App. Ct. at 343).

### 7.    Insurer's Duty to Refrain from Withholding Payment to Influence Settlement

111.    Mass. Gen. Laws ch. 176D, § 3(9)(m), prohibits insurers from "[f]ailing to settle

claims promptly, where liability has become reasonably clear, under one portion of

the insurance policy coverage in order to influence settlements under other

portions of the insurance policy coverage."

### 8.    Insurer's Duty to Provide Reasonable Explanation

112.    Mass. Gen. Laws ch. 176D, § 3(9)(n), imposes on insurers a duty "to provide

promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."

113.   Section 3(9)(n) does not impose "a particularly stringent" obligation on an insurer when explaining its basis for denying a claim.  *See Pediatricians, Inc. v. Provident Life & Accident Ins. Co.*, 965 F.2d 1164, 1172 (1st Cir. 1992) (finding straightforward, three-sentence letter to life insurance beneficiary "sufficient" in providing reasonable explanation of beneficiary's entitlement to $100,000 of proceeds instead of $200,000, as claimed); *cf. Whitney v. Cont'l Ins. Co.*, 595 F. Supp. 939, 947 (D. Mass. 1984) (finding subsection (n) violation where defendants never explained the basis for denying coverage under plaintiff's homeowner's policy).

**9.    Statute of Limitations**

114.   Claims brought under Chapter 93A must be commenced within four years after the cause of action accrues.  Mass. Gen. Laws ch. 260, § 5A.

115.   A cause of action under Chapter 93A generally accrues when a plaintiff knows, or reasonably should have known, of the injury attributable to defendant's conduct. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 994 (1st Cir. 1998).

116.   Under Massachusetts law, however, a claim under Chapter 93A arising out of a breach of an insurance policy that "rests on essentially the same alleged misconduct" as the breach itself does not accrue until the insurer "unequivocally

24

and finally" rejects the plaintiff's position.  *Nortek, Inc. v. Liberty Mut. Ins. Co.*, 65

Mass. App. Ct. 764, 770 (2006).

**B.**    **Analysis**

    **1.**    **Whether Utica Mutual Committed Unfair or Deceptive Acts or Practices**

117.    As noted, the District notified Utica Mutual of its claim in February 2000.  Utica

Mutual acknowledged receipt of the notice of claim in April 2000, and notified the

District that it would conduct its own investigation pursuant to a reservation of

rights.

118.    Under the circumstances, Utica Mutual did not violate Chapter 93A merely by

conducting its own investigation before paying or settling the entire claim.

119.    Under the circumstances, Utica Mutual would not have violated Chapter 93A

merely by requiring the District to provide additional proof of loss before paying or

settling the entire claim.

120.    As noted, Utica Mutual's investigation, which was conducted by the accounting

firm of Magnan Graizzaro, was completed by April 2001.  Magnan Graizzaro

concluded that an embezzlement of at least $150,000 had occurred in each of five

bond years, but that the proof was insufficient as to the other three years because

the evidence had been turned over to law enforcement officials.

121.    No later than April 2001, the liability of Utica Mutual to pay at least $150,000 on

a single bond had become reasonably clear.

122.    On October 18, 2001, Utica Mutual implicitly acknowledged to the District in

writing that it owed at least $150,000 on a single bond.

123.    On December 20, 2002, Utica Mutual expressly acknowledged to the District in writing that the $150,000 obligation "should be paid at this time."

124.    If Utica Mutual needed additional information to assess the District's claims, it should have requested that information at the latest within a reasonable period after receipt of the Magnan Graizzaro report.  Utica Mutual did not request any such additional information from the District until January 2004, more than two and one-half years later.  By the time the request was made, it was untimely and unreasonable.

125.    If Utica Mutual had any defenses to the payment of at least $150,000 on a single bond (such as misrepresentations in the application, the failure of the District to provide oversight of the activities of Blanchette, or the abolition of the position of Treasurer) it should have raised those defenses at the latest within a reasonable period after receipt of the Magnan Graizzaro report in April 2001.  Utica Mutual did not raise any such defenses until January 2004, more than two and one-half years later.  By the time those defenses were raised, they were untimely and unreasonable.

126.    Because it did not request any such additional information, and did not raise any such defenses to payment, and because its liability was reasonably clear, Utica Mutual should have paid the $150,000 owed on a single bond promptly after it received the Magnan Graizzaro report in April 2001.  Its failure to do so constituted an unfair or deceptive act or practice within the meaning of Chapter 93A.

26

127.   As noted, in October 2001, Utica Mutual offered to pay the $150,000 owed on a single bond to the District on the condition that the District waive its rights to recover on the additional bonds.  Utica Mutual did so in an effort to force a waiver of the District's remaining claims.  Its effort to do so constituted an unfair or deceptive act or practice within the meaning of Chapter 93A.

128.   As of at least April 2001, Utica Mutual disputed whether it owed any obligation other than a $150,000 payment on a single bond.

129.   Although Utica Mutual's position as to whether it owed an obligation as to more than one bond was incorrect as a matter of law, the taking of that position was not so unreasonable or implausible as to constitute an unfair or deceptive act or practice within the meaning of Chapter 93A.

130.   Utica Mutual's explanation in April 2001 for its denial of coverage of more than one bond claim—that the actions of Blanchette gave rise to "a single claim, which occurred over a continuous period of time"—was minimal at best.  Nonetheless, it served to put the District on notice of Utica Mutual's legal position.  The explanation, while far from exemplary, was not so unreasonable as to constitute an unfair or deceptive act or practice within the meaning of Chapter 93A.

131.   In January 2004, and for the first time, Utica Mutual asserted various defenses to the payment of any amounts on any of the bonds, including alleged misrepresentations in the application, the failure of the District to provide oversight of the activities of Blanchette, and the abolition of the position of Treasurer.

132.   The Court makes no finding as to whether the substance of those defenses was so
unreasonable or implausible that their mere assertion constituted an unfair or
deceptive act or practice within the meaning of Mass. Gen. Laws ch. 93A.

133.   However, the timing of the assertion by Utica Mutual of those defenses (more than
two and one-half years after the Magnan Graizzaro investigation was complete,
during which period it engaged in discussions and negotiations with the District
without raising the issue)—and the shifting and inconsistent nature of its position
(it had previously acknowledged liability as to $150,000 on a single
bond)—together constituted an unfair or deceptive act or practice within the
meaning of Chapter 93A.

134.   The District contends that Utica Mutual's motive for belatedly raising defenses in
January 2004 was to attempt to avoid liability under Chapter 93A for its previous
act of conditioning payment of $150,000 on a waiver of all other claims.  The
Court does not find it necessary to reach that issue and accordingly makes no
finding in that respect.

135.   As noted, in December 2008, after the Court issued its opinion on summary
judgment, Utica Mutual paid the District on five of the eight bonds.  As to the
other three bonds, Utica Mutual refused to pay in full without additional proof of
loss.

136.   Utica Mutual's assertion for the first time in December 2008 that it required
additional proof of loss—more than seven years after the Magnan Graizzaro
investigation was complete (during which period it engaged in discussions and

28

negotiations with the District without raising the issue)—constituted an unfair or deceptive act or practice within the meaning of Chapter 93A.

2.    **Whether the Claims Are Barred by the Statute of Limitations**

137.    As noted, this lawsuit was filed on September 29, 2006, and thus any claim under Chapter 93A that accrued before September 29, 2002, is time-barred.

138.    The Court previously found, in ruling on the parties' cross-motions for summary judgment, that "[t]he chapter 93A claim is . . . not time-barred." (Doc. 30, at 16). Upon further reflection, and because the violations of Chapter 93A are based on discrete acts that must be independently analyzed, the Court concludes that some of the claims are time-barred and others are not, as explained more fully below.

139.    Utica Mutual committed two violations of Mass. Gen. Laws ch. 93A before September 29, 2002:  (1) it failed to pay the District promptly at least the $150,000 owed on a single bond and (2) it offered to pay the $150,000 on the condition that the District waive its rights under the other bonds.  The first violation occurred no later than April 2001 and the second violation occurred no later than October 2001.

140.    The District's claims under Chapter 93A based on Utica Mutual's failure to pay the District promptly on a single bond accrued in April 2001.  By that point, the District knew, or reasonably should have known, of the injury attributable to Utica Mutual's conduct.

141.    The District's claims under Chapter 93A based on Utica Mutual's offer to pay the $150,000 on condition that the District waive its rights under the other bonds

accrued in October 2001.  By that point, the District knew, or reasonably should

have known, of the injury attributable to Utica Mutual's conduct.

142.    The District's claims under Chapter 93A that accrued in April 2001 and October

2001 are time-barred, as the complaint was filed more than four years after those

claims accrued.

143.    It appears that any claim under Chapter 93A based on the underlying contractual

dispute—that is, based on Utica Mutual's position that it owed only an obligation

on a single bond, rather than all eight bonds—would not be time-barred, as Utica

Mutual did not make a final and unequivocal rejection of the District's position

until October 2005.  However, as noted above, Utica Mutual's taking of that

position was not so implausible that it violated Chapter 93A, and thus the Court

does not need to reach the issue.

144.    The District's remaining claims under Chapter 93A (that is, its claims based on

Utica Mutual's assertion of new and inconsistent defenses for the first time in

January 2004 and its demand for additional proof of loss in December 2008) were

timely filed.

### 3.    Other Issues

145.    The District suffered a "loss of money or property" within the meaning of Mass.

Gen. Laws ch. 93A, § 11 as a result of the violations.  Among other things, the

District lost the use of the money to which it was entitled and was required to

incur attorneys' fees and other expenses to assert its rights.

146.    Utica Mutual did not commit a willful or knowing violation of Mass. Gen. Laws

30

ch. 93A.

147.    Utica Mutual has paid the District on all eight bonds, with interest.  The District's

actual damages caused by the violations of Chapter 93A have thus been recovered

from Utica Mutual, and any additional award of actual damages would be

duplicative.

148.    The District is entitled to its reasonable attorneys' fees and costs incurred in

litigating the Chapter 93A violations in this action.

**III.    Conclusion**

1.    The Court finds, for the reasons stated above, that defendant Utica Mutual

Insurance Company violated Mass. Gen. Laws ch. 93A, §§ 2, 11, and awards

plaintiff Southern Worcester County Regional Vocational School District its

reasonable attorneys' fees and costs incurred in litigating those violations in this

action.

2.    Counsel for the District is hereby directed to submit a detailed affidavit setting

forth its reasonable attorneys' fees and costs within 21 days of the date of this

memorandum.

3.    Defendant Utica Mutual's Motion for Judgment on Partial Findings is granted as

to Count 1 and denied as to Count 2 for the reasons set forth above.

**So Ordered.**

                                                    /s/ F. Dennis Saylor
                                                    F. Dennis Saylor IV
Dated: August 13, 2010                              United States District Judge